FILED
2015 Aug-28  AM 11:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **WILLIAM WAYNE SANDERS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 2:14-CV-617-KOB** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant** ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On June 29, 2010, the claimant, William Sanders, filed an application for Social Security

Supplemental Income (SSI). (R. 248-251). The claimant alleged disability beginning January 17,

2010, because of heart disease and back disc problems. (R. 264). The Social Security

Administration denied the claim initially on December 15, 2010. (R. 184-186). On January 20,

2011, the claimant filed a written request for a hearing before an Administrative Law Judge. (R.

194-196). The ALJ held a video hearing on September 5, 2012. (R. 121).

In a decision dated December 6, 2012, the ALJ found that the claimant was not disabled

as defined by the Social Security Act and, therefore, was ineligible for SSI benefits. (R. 122). On

February 5, 2014, the Appeals Council denied the claimant's request for review, but indicated

that it had reviewed the new evidence submitted by the claimant but that the evidence related to a

time after the ALJ's decision.  The Appeals Council informed the claimant that if he wanted it to

consider whether he was disabled after December 6, 2012, he would need to reapply for

1

disability.  (R. 3).

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ properly applied the Eleventh Circuit's pain standard when evaluating the credibility of the claimant's subjective complaints of pain; (2) whether the ALJ mischaracterized the claimant's work history when evaluating his residual functional capacity; (3) whether the ALJ improperly considered the claimant's "non-compliance" with medication; and (4) whether the Appeals Court properly considered the additional evidence the claimant submitted after the ALJ hearing.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable

3

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months...". 42 U.S.C.

§423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next
> question or, on steps three and five, to a finding of disability. A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

When evaluating subjective complaints, such as pain, the Commissioner must apply the

Eleventh Circuit's pain standard. The Commissioner must determine whether: (1) evidence of an

underlying medical condition exists; and *either* (2) objective medical evidence "confirm[s] the

severity of the alleged pain arising from that condition," *or* (3) that the objectively determined

medical condition "is of such a severity that it can reasonably be expected to cause the alleged

pain." *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir. 1995); *Holt v. Sullivan*, 921 F.2d 1221,

1223 (11th Cir. 1991); *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986). In applying the

pain standard, for the ALJ to discredit the claimant's subjective complaints of pain without

explicitly articulating her reasons for doing so is reversible error. *Brown v. Sullivan*, 921 F.2d

1233, 1236 (11th Cir. 1991).

Further, in evaluating subjective claims including pain, the Commissioner may consider

the claimant's ability to perform certain activities of daily living (ADLs), as well as the impact of

his abilities on the claimant's credibility. 20 C.F.R. §404.1529(c)(3)(1), 416.929(c)(3)(1); *see also Macia v. Bowen*, 828 F.2d 1009, 1012 (11th Cir. 1987) (finding that ADLs may be relevant to the fourth step of the sequential process.)

Refusal by a claimant to follow prescribed medical treatment without good cause will preclude a finding of disability. 20 C.F.R. § 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison,* 355 F.3d 1272, 1275 (11th Cir. 2003). If the ALJ relies solely on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination regarding the claimant's ability to afford treatment. *Id.* If the ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance, though, the ALJ does not commit reversible error by failing to consider the claimant's financial situation. *Id.* at 1276.

The Appeals Council may receive new and material evidence, and the Council must consider such evidence in determining whether to review the ALJ's decision. 20 C.F.R. §§ 404.967, 404.970(b); *Falge v. Apfel*, 150 F.3d 1320, 1322-24 (11th Cir. 1998).

## V. FACTS

The claimant was forty-eight years old at the time of the ALJ's decision. (R. 141). He has a ninth-grade education, and his past work experience includes employment as a sheet rock finisher and a painter. (R. 155, 299). The claimant alleged disability beginning on January 17, 2010. (R. 264). The claimant originally alleged that he was unable to work because of heart disease and back disc problems. (R. 264). At the hearing, the claimant testified that he is unable to work because of shortness of breath, high heart rate, loss of energy, heart disease, and low

5

back pain. The claimant stressed that his pain from his physical impairments was the primary reason that he could not work. (R. 156-158).

*Physical Limitations*

On June 21, 2004, Dr. Sharon Dailey admitted the claimant into the emergency room at UAB Hospital. The claimant suffered an acute myocardial infarction and underwent cardiac catheterization. Dr. Dailey also diagnosed the claimant with hypertension, tobacco abuse, and dyslipidemia. (R. 336).

Dr. Robert Kynerd from the UAB Family Medicine Clinic has been the claimant's primary care physician since at least 2004. (R. 339). On February 12, 2008, Dr. Kynerd diagnosed the claimant with hypertension and prescribed medication. (R. 353). On October 10, 2009, the claimant reported to Dr. Kynerd that he had back and rib pain and that he needed a refill of his hypertension medication that had run out four days earlier. Dr. Kynerd prescribed Lortab for the claimant's pain and refilled the claimant's blood pressure medication. (R. 354).

On January 18, 2010, the claimant was hospitalized at UAB Hospital after complaining of chest pain, agitation, and shaking. The claimant admitted to Dr. Bobby Lewis, the attending physician, that the shaking occurred as a result of his heavy drinking and that he had been on an "alcohol binge" the past four nights. Dr. Lewis documented the claimant as suffering from coronary artery disease, and the claimant admitted to smoking daily. Dr. Lewis noted that the claimant had a regular heart rate and clear lungs during hospitalization, and reported that the claimant's chest x-ray was clear. The claimant was hospitalized for nine nights, and his echo cardiogram revealed that his left ventricular ejection fraction was 35%. Dr. Lewis indicated that this low percentage corroborated the claimant's complaints of chest pain. (R. 331-333).

6

On March 9, 2010, the claimant returned to UAB Hospital and complained of chest pain. Dr. Matthew Kelly, the claimant's attending physician, noted that the claimant admitted to drinking five beers that day and was "significantly intoxicated" at the time of presentation. The claimant admitted that he began drinking several days before, after months of abstinence. Dr. Kelly reported that the claimant's EKG was normal and that the claimant's vitals were stable. Dr. Kelly also noted that, although the claimant was intoxicated, he was able to answer questions appropriately and follow commands.  Dr. Kelly admitted the claimant to the hospital for further evaluation and stabilization. (R. 455-456).

The next day, Dr. Dennis Pappas of UAB Hospital evaluated the claimant. Dr. Pappas diagnosed the claimant with chest pain "of a non-cardiac origin" and alcohol intoxication. After conducting a physical examination of the claimant, Dr. Pappas found that the claimant had a "normal rate and rhythm" on his cardiovascular exam, that his lungs were clear, and that the claimant's EKG showed no evidence of a heart attack. Dr. Pappas reported that the claimant was taking aspirin, beta-blockers, and ACE inhibitors to manage his coronary artery disease. (R. 453-454).

On June 21, 2010, Dr. Kynerd reported that the claimant had poor heart function and that it was "getting to where [the claimant] can no longer work." Dr. Kynerd recorded the claimant's left ventricular ejection function of 35% and prescribed medication for the claimant's hypertension, coronary artery disease, and back pain. During this appointment, Dr. Kynerd completed a Physician Disability Confirmation Form for the claimant, explaining that the claimant suffers from heart disease "with coronary artery disease." Dr. Kynerd also wrote that he does not anticipate improvement for the claimant's heart issues and considered him unable to

work. (R. 349, 471).

On September 21, 2010, the claimant sought a medical examination from Dr. Philip Badewa at Utmost Healthcare Center at the request of the Social Security Administration. The claimant complained of pain in his back and joints, as well as chest pain and pressure. Dr. Badewa conducted a physical examination of the claimant and reported that the claimant presented with a normal gait and a full range of motion in all extremities. Dr. Badewa noted that, while he did not observe any wheezing from the claimant, he observed decreased air entry bilaterally, a normal heart rate, and an early systolic murmur. Dr. Badewa also explained that medication controlled the claimant's chronic hypertension. Generally, the claimant's cardiac exam produced normal results. (R. 367-373).

On November 9, 2010, Dr. James Johnson of the UAB Pulmonary Function Laboratory conducted a pulmonary function test for the claimant at the request of the Disability Determination Service.  Dr. Johnson found that the claimant had a "mild obstructive lung defect." Dr. Johnson indicated that the test reported a decrease in air flow rate throughout the test's duration, and he recommended more detailed pulmonary function testing.  (R. 374-383).

On December 13, 2010, Christine Howard, a single decision maker for the Social Security Administration, evaluated the claimant for a physical residual functional capacity assessment. Ms. Howard noted that the claimant could occasionally lift twenty pounds and frequently lift ten pounds; could stand and/or walk as well as sit for a total of six hours in an eight-hour workday; had no limitations on his ability to push and/or pull; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; but could never climb a ladder/rope/scaffolds. Ms. Howard also found that the claimant should avoid concentrated

exposure to extreme heat, humidity, and fumes, as well as avoiding all exposure to hazardous machinery and unprotected heights. (R. 176-180).

Ms. Howard described the claimant's daily living activities, explaining that the claimant has problems sleeping, does not cook, and does few household chores. She explained that the claimant was able to go out alone and does go shopping, although the claimant does not drive. Ms. Howard emphasized that the claimant's pain was located in the chest and had spread to his arms and legs. Although she explained that the claimant's pain has worsened, Ms. Howard also mentioned that the claimant's medication helps relieve the pain. Ms. Howard also stated that the claimant indicated that his alleged heart disease and back disc problems prevent him from working. (R. 181).

On January 12, 2011, Dr. Todd Peterson at UAB Hospital admitted the claimant into the hospital after the claimant complained of abdominal pain. The claimant reported to Dr. Peterson that he had been helping his brother lift sheet rock about four days earlier, when he immediately felt a sharp pain in his right side. Dr. Peterson noted that the claimant's pain came and went over the next two days, but became constant the last two days. The claimant informed Dr. Peterson that any type of movement or lying on his side made the pain worse. Dr. Peterson stated that the claimant had taken medicine to try and relieve the pain, but the medicine was not successful. Although Dr. Peterson recorded the claimant's documented coronary artery disease, he also noted that the claimant smoked tobacco and drank alcohol. Dr. Peterson ordered an EKG, and the results showed no acute abnormalities. Dr. Peterson indicated that the claimant had normal sinus rhythm, that his lungs were clear, and that his heart size was normal. (R. 443-445).

On July 15, 2011, the claimant was hospitalized for four nights because of unstable

angina. Dr. Ronnie Mathews, the claimant's attending physician, conducted a cardiac stress test

on the claimant and reported that the results were positive for ischemia. Dr. Mathews reported

that the claimant still smoked a pack a day, but his cardiovascular exam results came back clear.

Dr. Mathews indicated that the claimant's lungs were clear, that his heart was beating at a normal

rate, and that the tests detected no murmurs. Dr. Mathews reported no acute EKG changes and

recorded the claimant's left ventricular ejection fraction at 49%, an improvement from 35% in

January 2010. After careful observation for four nights, Dr. Mathews prescribed medication to

the claimant and discharged him on July 19, 2011. (R. 417-420).

Between July 15, 2011 and May 2, 2012, the claimant continued to visit Dr. Kynerd for

appointments. These appointments focused on unrelated medical issues. (R. 465-468).

On May 2, 2012, Dr. Kynerd completed a Physician Disability Confirmation Form at the

claimant's request. Dr. Kynerd reported that the claimant suffered from heart disease, with a left

ventricular ejection fraction of 35% , and coronary artery disease. Similar to the form that he

completed in 2010, Dr. Kynerd indicated that he does not anticipate improvement of the

claimant's heart problems. (R. 464).

On October 2, 2012, at the request of Disability Determination Services, Dr. Harold Settle

of the Birmingham Heart Clinic performed a consultative physical examination of the claimant.[1]

Dr. Settle explained the clamant's medical history, specifically focusing on the claimant's

coronary artery disease and hypertension. Dr. Settle noted that the claimant reported that he had

quit smoking 15 months prior and that he had not worked since 2010. The claimant explained to

Dr. Settle that whenever he tried to work, he had no energy and his heart began to race. Dr.

---

[1]  The ALJ incorrectly refers to Dr. Settle as "Dr. Setrie" in his decision.

Settle's physical examination of the claimant reported normal chest readings and no evidence of heart murmurs. (R. 472).

On January 28, 2013, Dr. James Willig of UAB Hospital admitted the claimant into the hospital after he was found unresponsive. Dr. Willig reported that the claimant had symptoms that were consistent with a drug overdose, leading to respiratory failure. Although Dr. Willig's primary diagnosis focused on the claimant's mental limitations, Dr. Willig also diagnosed the claimant with systolic heart failure and environmental stressors. (R. 34-36).

On May 4, 2013, Dr. Jessica Merlin of UAB Hospital admitted the claimant into the hospital after the claimant complained of chest pain, shortness of breath, and left arm pain. Dr. Merlin indicated that the claimant's EKG was unremarkable, that all cardiac markers were negative, and that the claimant controlled his chest pain with medication. Dr. Merlin discharged the claimant on May 9, 2013, with a request that the claimant schedule a  follow-up appointment with Dr. Kynerd. (R. 60-62). No records indicate that the claimant attended a follow-up appointment with Dr. Kynerd.

On July 25, 2013, the claimant presented himself to Dr. Eddie Mathews at UAB Hospital with complaints of upper extremity deep vein thrombosis. Dr. Mathews noted the claimant's history of chest pain and heart issues, but he did not determine whether the claimant's deep vein thrombosis and heart issues were related. Dr. Mathews started the claimant on anticoagulation, and he reported marked improvement with the claimant's pain and swelling. Dr. Mathews discharged him on July 30, 2013, in "good" condition. (R. 106-107).

*Mental Limitations*

At the request of Disability Determination Service, Dr. Holly Deemer performed a

11

consultative psychological evaluation of the claimant on October 5, 2010. At the evaluation, Dr. Deemer noted that the claimant's mood was "depressed and tired." Dr. Deemer stated that the claimant's performance on tests of concentration and attention fell below expectation and that the claimant had a poor ability to retain new information. Dr. Deemer noted that the claimant had reported that he participated in special education classes while he was in school. (R. 363-364).

Dr. Deemer explained that the claimant had appropriate judgment and showed no difficulty in tasks requiring abstract thinking. When asked about his daily activities, the claimant informed Dr. Deemer that he is independent in his personal hygiene tasks and that he is able to prepare a simple meal. The claimant told Dr. Deemer that he does minimal housework or yard work because of his fatigue. (R. 364).

The claimant also informed Dr. Deemer that he is not engaged in any social activities, and he is frustrated with being unable to work. Dr. Deemer's diagnostic impression was major depressive disorder and below average intellectual functioning. Dr. Deemer summarized that the claimant would be able to understand, recall, and carry out instructions consistent with previous employment but would have difficulty with new or unfamiliar tasks. (R. 363-365).

On December 15, 2010, Dr. Robert Estock, the state-agency consulting psychiatrist, completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Form. Dr. Estock examined the claimant and evaluated his medical records to complete the forms. Dr. Estock assessed that the claimant has recurring major depressive disorder, as well as general anxiety disorder, basing both diagnoses in the claimant's medical evidence. Furthermore, Dr. Estock found that the claimant suffered from alcohol dependence and faced moderate limitations in daily living activities, maintaining social functioning, and maintaining

12

concentration, persistence, and pace. Dr. Estock reported that the claimant had informed him that he was fired from his job in 2009 because of his nerves. Dr. Estock reported that the claimant was considered "partially credible," as his subjective statements were mildly consistent with the objective findings in his medical record. Dr. Estock concluded that the claimant can work at the unskilled level. (R. 386-398).

Dr. Estock also evaluated the claimant's mental residual functional capacity, finding that the claimant is able to understand and remember simple instructions. Furthermore, Dr. Estock explained that the claimant could attend and concentrate for two-hour periods on simple tasks with rest breaks during the regular workday. Dr. Estock recommended that the claimant should engage in casual and non-confronting interaction with supervisors and coworkers, and the claimant's supervisors should gradually introduce any changes in the workplace. (R. 400-403).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental social security income, the claimant requested and received a hearing before an ALJ. (R. 213-239). At the September 5, 2012 hearing, the claimant testified that he is unable to work because of fatigue, shortness of breath, and a high heart rate. The claimant explained that he also has low back pain that worsens whenever he tries to lift something or when he is moving around. He stated that taking Lortab helps control the back pain. (R. 155-156).

The claimant testified that his heart problems prevent him from working, and his depression and anxiety stem from his frustration towards his current unemployment. The claimant stated that his mental problems are mainly a result of his physical problems. He explained that he tries to walk around during the day, but he gets tired very quickly and has to sit

13

down. The claimant stated that he is on his feet for a total of two hours each day and can only walk for about ten minutes before his heart rate goes up and he loses his breath. He testified that, when he is not standing, he alternates between sitting and lying down. The claimant indicated that the heaviest thing he can lift is a gallon of milk. When asked if he could perform a "super easy" job, the claimant answered that he would not be able to perform it.(R. 158-162).

The claimant testified that he has abstained from alcohol since June 2010. He explained that he quit drinking early in 2010, but he went to the hospital after relapsing in June 2010. The ALJ questioned the claimant on his history of alcohol abuse, mentioning that the claimant reported during a hospital visit in July 2011 that he had quit drinking "five months ago." The claimant admitted that his official quit date occurred in February 2011 and explained that he quit drinking "on his own." The claimant denied the possibility that his alcohol abuse contributed to him losing his job in December 2009 and testified that his heart problems contributed to his unemployment. When the ALJ asked the claimant about why he lost his job in December 2009, the claimant answered that the work had run out and his contractor laid him off. (R. 163-166).

The claimant testified that his last visit to a cardiologist was in July 2011 at UAB Hospital. The claimant explained that he was in the hospital to have a heart catheter installed. Although the doctor recommended a follow-up appointment with the cardiologist, the claimant stated that he went back to Dr. Kynerd instead because he had no insurance. (R. 168-169).

Finally, the claimant testified that he quit smoking in January 2011.  The ALJ stated that the claimant had indicated to Dr. Kynerd in May 2012 that he was smoking half a pack a day. The claimant explained that the indication was a mistake and that he had not smoked since January 2011. (R. 169).

14

A vocational expert, Ms. Jacobson, testified concerning the type and availability of jobs that the claimant was able to perform. She classified the claimant's past job as a commercial and residential painter as "medium" and the claimant's performance of the job as "heavy." She also classified the claimant's past job as a sheetrock finisher as "medium" and the claimant's performance of the job as "heavy."

The ALJ asked Ms. Jacobson to assume a hypothetical person capable of performing light work, with the following limitations: could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; could occasionally stoop, kneel, crouch, crawl, and engage in activities requiring balance; should avoid concentrated exposure to extreme cold, extreme heat, and humidity; should avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas; should avoid all exposure to operational control of moving machinery and unprotected heights; could do work that is simple, routine, and repetitive in nature; could perform a low stress job that requires occasional decision making and occasional changes in the work setting; can only have occasional interaction with the public and with coworkers; and could not understand complex written or verbal communication. The ALJ asked Ms. Jacobson whether, if the ALJ found these limitations credible, the claimant would be able to return to any of his past work. Ms. Jacobson responded that under these circumstances, the claimant could not return to his past work. (R. 171-172).

The ALJ then asked Ms. Jacobson if any other competitive work exists that the hypothetical individual could perform, considering the claimant's age, education, and experience. Ms. Jacobson responded with three example jobs that the claimant could perform: packer, with 2,800 packer jobs in Alabama and 465,000 nationally; product assembler, with about 2,000

product assembler jobs in Alabama and 94,000 nationally; and quality control inspector, with 3,000 jobs in Alabama and 107,000 nationally. Ms. Jacobson testified that all three jobs were classified as "light" work. (R. 172).

The ALJ also asked Ms. Jacobson to assume the same limitations that were provided in the first hypothetical; however, the exertional level changed to sedentary. The ALJ asked Ms. Jacobson if any competitive jobs existed at the sedentary level that the hypothetical individual could perform. Ms. Jacobson responded with three examples of sedentary jobs: product assembler, with 1,500 jobs  in Alabama and 48,000 nationally; production line table worker, with 2,000 jobs in Alabama and 110,000 nationally; and automatic machine tender, with about 1,000 jobs in Alabama and 31,000 nationally. (R. 172-173).

Ms. Jacobson testified that a competitive employee has to be on-task for periods of at least two hours and that a competitive employee cannot be off-task for more than 20 percent of the workday. Furthermore, Ms. Jacobson testified that a competitive employee can only miss about a day-and-a-half of work per month; she explained that this limitation is especially true for unskilled workers who are easily replaceable. (R. 173-174).

The ALJ then asked Ms. Jacobson to assume the same limitations that were provided in the second hypothetical; however, in addition, the individual would be off task on a consistent basis more than twenty percent of the workday in addition to regularly scheduled breaks. The ALJ asked Ms. Jacobson if all competitive jobs would be eliminated, and she answered yes. (R. 174).

Finally, the ALJ asked Ms. Jacobson to assume the same limitations provided in the second hypothetical; in addition, the individual would miss two or more days of work per month

on an unexcused or unscheduled basis. The ALJ asked Ms. Jacobson if these limitations would

eliminate all competitive jobs, and Ms. Jacobson answered that they would. (R. 174).

*The ALJ's Decision*

On December 6, 2012, the ALJ issued a decision finding that the claimant was not

disabled under the Social Security Act. First, the ALJ found that the claimant had not engaged in

substantial gainful activity since June 29, 2010. (R. 122).

Next, the ALJ found that the claimant had the following severe impairments: status post

2004 myocardial infarction with multiple cardiac catheterizations; coronary artery disease;

chronic obstructive pulmonary disease with nicotine abuse; heart murmur; chest pain syndrome;

hypertension; alcohol abuse; general anxiety disorder; major depressive disorder; and learning

delays including limited literacy. The ALJ also noted the claimant's non-severe impairments of

back pain, dyslipidemia, gastroesophageal reflx disease, and his use of prescriptive lenses.

Although the claimant testified that he was diagnosed with congestive heart failure, the ALJ

found no diagnosis of congestive heart failure within the record and concluded that this

suggested diagnosis was not medically determinable. (R. 124-125).

Furthermore, the ALJ noted that the claimant's severe and non-severe impairments did

not, singly or in combination, meet or medically equal the severity of a listed impairment. (R.

125).

After considering the entire record, the ALJ found that the claimant has the residual

functional capacity to perform "light work" with the following limitations: he can lift, carry,

push, and pull twenty pounds occasionally and ten pounds frequently; he can sit, stand, and walk

six hours each intermittently throughout an eight-hour workday; he never climb latters, ropes, or

scaffolds; he can occasionally climb stairs and ramps; he can occasionally stoop, kneel, crouch, crawl, and engage in activities requiring balance; he must avoid concentrated exposure to extreme heat and cold temperatures, humidity, and respiratory irritants such as fumes, odors, dusts, gases, and poorly ventilated areas; he must avoid all exposure to operational controls of moving machinery and unprotected heights; he is limited to simple, routine, and repetitive tasks; he is limited to work in a low-stress environment defined as requiring only occasional decision-making and only occasional changes in work setting; he is limited to only occasional interaction with the public and co-workers; and he is limited to work that does not require complex written or verbal communications. (R. 128-129).

The ALJ considered medical and opinion evidence, as well as the claimant's testimony, to determine the claimant's residual functional capacity. The ALJ emphasized the claimant's mental limitations as supported by evidence in the record. Specifically, the ALJ mentioned the claimant's history of special education classes and documented cognitive defects that were consistent with his limited education and reported literacy problems. The ALJ concluded that this evidence merited the claimant's restriction to simple, routine, and repetitive tasks without complex written or verbal communications. Furthermore, the ALJ found that medication improved the claimant's general anxiety disorder and major depressive disorder; thus, the ALJ stated that the claimant was mentally capable of working in a low-stress environment with occasional decision-making, occasional changes in the work setting, and occasional interaction with the public and co-workers. (R. 130).

The ALJ found that Dr. Estock's opinion evidence was consistent with the evidence, including the claimant's admission of his daily living activities, and credited Dr. Estock's careful

18

consideration of the claimant's record as a whole. Therefore, the ALJ found that Dr. Estock's findings were entitled to "significant weight." (R. 137-138).

In addition, the ALJ gave little weight to Dr. Deemer's opinion evidence, mainly because he found her opinion to be "vague and ambiguous." She failed to indicate any social functioning limitations, despite noting that the claimant suffers from general anxiety disorder. The ALJ found that because Dr. Deemer failed to fully appreciate the claimant's social deficits, he afforded her opinion little weight to his conclusion. (R. 138).

The ALJ found that, although the claimant's medically determinable physical impairments could "reasonably be expected to cause the alleged symptoms," the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the objective medical evidence in the record. (R. 130).

To support his conclusion, the ALJ summarized the claimant's medical records and noted the inconsistencies with the claimant's allegations of physical pain. The ALJ noted that the evidence of the claimant's alleged cardiac and respiratory issues merited the light residual functional capacity for the claimant. Regarding heart-related symptoms, the ALJ stated that the claimant suffered a heart attack in 2004 and underwent cardiac catheterization, and he was hospitalized in January 2010, partially because of chest pain. The ALJ explained that notably, during this hospitalization, the claimant admitted to binge drinking liquor and a case of beer per day. Furthermore, the ALJ found that the claimant continued to smoke, despite his coronary artery disease. (R. 133-134).

In addition, the ALJ observed that, although the claimant's left ventricular ejection

fraction measured at 35% in January 2010, the claimant produced this reading after a period of prolonged binge drinking. The ALJ also noted that, during this hospitalization, the claimant had a clear chest x-ray and a regular heart rate. The ALJ found that the claimant's 2010 physical exam results suggested generally good cardiac and respiratory functioning, despite the documented coronary artery disease. (R. 133).

The ALJ noted that the claimant's cardiac exam findings were generally normal during his January 2011 exam with Dr. Peterson; the ALJ emphasized that the claimant's lungs were clear and his heart size and EKG were both normal. The ALJ found that, although the claimant had been hospitalized in July 2011 because of unstable angina, the claimant's left ventricular ejection fraction measured at 49% during that hospitalization; the ALJ considered this a great improvement from the 35% reported in January 2010. In addition, the ALJ noted the claimant's diagnoses of chest pain syndrome and left ventricular dysfunction. (R. 134-135).

Furthermore, the ALJ evaluated the claimant's daily living activities. The ALJ emphasized that, although the claimant testified that he mainly just sat or laid around, his admissions within the record suggested "at least the capacity for most typical activities of daily living." The ALJ noted that specifically, during his evaluations with Dr. Deemer and Dr. Estock, the claimant admitted that he shopped monthly, did his own laundry, was independent in his personal hygiene tasks, and performed chores and yard work. Although the ALJ found that Dr. Deemer's report of the claimant's cognitive deficits corroborated the claimant's testimony regarding his literacy difficulties, the record contained no medical evidence corroborating the claimant's testimony that he was only on his feet "two hours a day" and could only walk "for 10 minute intervals."

20

(R. 131).

The ALJ recognized that Ms. Howard's report corroborated the claimant's testimony, but the ALJ determined that Dr. Howard was a single decision maker in her assessment. The ALJ explained that the Agency does not consider the assessments of single decision makers to be opinion evidence; therefore, the ALJ afforded no weight to Ms. Howard's report. (R. 139).

In addition, the ALJ considered the claimant's work history when evaluating the credibility of the claimant's allegations. The ALJ observed that, despite suffering a heart attack in 2004, the claimant reported to Dr. Deemer that he worked as a sheet rocker for 25 years until 2010; the ALJ indicated that the claimant had worked for several years after his heart attack. The ALJ explained that the claimant testified that his job ended in December 2009, when his contractor laid him off because of a lack of work. (R. 131).

The ALJ also noted that after his layoff in 2009, the claimant testified that he attempted to work as a sheetrock finisher for four days before stopping because of a lack of energy, breathing difficulties, and a racing heartbeat. The ALJ found that, according to the vocational expert's testimony, the sheetrock finishing job was medium work, and the claimant performed the work at a heavy level. Therefore, the ALJ concluded that although the claimant struggled with performing this work, the claimant's light residual functional capacity did not include the exertional demands required to hang sheet rock. The ALJ found that the claimant's work history somewhat diminished the credibility of his allegations of disabling pain, as his work history suggested an ongoing ability to engage in work-related activities. (R. 131).

The ALJ also considered evidence of the claimant's non-compliance. The ALJ explained that the claimant admitted, during several hospital visits throughout the years, to heavy drinking

and heavy smoking, despite having suffered a heart attack in 2004. The ALJ reported that, during his evaluation with Dr. Deemer in October 2010, the claimant stated that he had stopped drinking just four weeks before; the ALJ observed that this report contradicted the claimant's hearing testimony that he had been sober since June 2010. The ALJ noted that the claimant changed his testimony, asserting a sobriety date of February 2011, after he was "confronted by his admissions within the record." More specifically, the claimant had admitted to smoking and drinking as of January 2011, during a visit to UAB Hospital. The ALJ found that the claimant's assertions regarding his sobriety lacked significant credibility. (R. 132-133).

In addition, the ALJ noted that the claimant testified that he had not seen his cardiologist since July 2011, which suggested that the claimant's condition had remained stable since then. Although the ALJ noted that the claimant testified that he had difficulty affording care, the ALJ observed that had the claimant experienced significant cardiac symptoms, he could have sought ER intervention. (R. 135-136).

In sum, the ALJ recognized that the claimant had ongoing cardiac and respiratory limitations, based on medical evidence, that merited the workplace limitations that the claimant's residual functional capacity included. In addition, the ALJ added hazard restrictions in light of the claimant's documented hypertension and alcohol abuse. Furthermore, the ALJ included respiratory and environmental limitations in the claimant's residual functional capacity because of the claimant's documented heart disease and chronic obstructive pulmonary disease. (R. 136).

After assessing the claimant's residual functional capacity, the ALJ found that the claimant was unable to perform past relevant work. The ALJ noted the claimant's age, education, work experience, and residual functional capacity, and found jobs that existed in significant

numbers in the national economy that the claimant could perform. The ALJ referenced the

testimony of the vocational expert, and listed the jobs that the vocational expert stated that the

claimant could perform: packer, product assembler, quality control inspector, similar product

assembler, production line table worker, and automatic machine tender. Therefore, the ALJ

concluded that the claimant was not disabled as defined under the Social Security Act. (R. 140-

142).

## VI. DISCUSSION

**1.  The ALJ properly evaluated the claimant's subjective complaints of pain.**

The claimant argues that the ALJ improperly applied the Eleventh Circuit's pain standard.

To the contrary, this court finds that the ALJ properly applied the pain standard and that

substantial evidence supports his decision.

The pain standard applies when a claimant attempts to establish disability through his

own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223

(11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition

and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising

from that condition *or* (3) that the objectively determined medical condition is of such a severity

that it can be reasonably expected to give rise to the alleged pain." *Id*. (emphasis added). A

claimant's subjective testimony supported by medical evidence that satisfies the pain standard is

itself sufficient to support a finding of disability. *Foote*, 67 F.3d at 1561.

In applying the standard, if the ALJ decides not to credit a claimant's subjective

testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown*,

921 F.2d at 1236. Failure to articulate the reasons for discrediting the claimant's subjective

23

complaints of pain requires that the testimony be accepted as true. *Id.*

The ALJ properly articulated his reasons for discrediting the claimant's subjective complaints of pain. In this case, the ALJ conceded that the claimant's medically determinable physical impairments could reasonably be expected to cause the alleged symptoms; however, he found that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the objective medical evidence. The ALJ relied on the claimant's daily activities, testimony, work history, and medical records as evidence that his physical capabilities were greater than what he had alleged.

The claimant argues that the ALJ improperly evaluated the claimant's daily activities as inconsistent with his complaints of pain. When evaluating subjective complaints, the ALJ may take the claimant's daily activities into account. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). The ALJ noted that the claimant admitted to shopping monthly, doing his own laundry, independently completing his personal hygiene tasks, and performing minimal chores and yard work. The ALJ found that these admissions suggested a greater functioning capacity than what the claimant indicated in his hearing testimony. Notably, the ALJ accounted for the claimant's medically determinable severe impairments by setting limitations on the claimant's residual functional capacity. Furthermore, the ALJ explained that the claimant's daily activities reflected "adequate functioning" and reduced the claimant's allegations of disabling impairment. (R. 131).

## 2. The ALJ properly characterized the claimant's work history.

The claimant also contends that the ALJ mischaracterized the claimant's work history. The ALJ may consider the claimant's work history when evaluating the claimant's residual

24

functional capacity. 20 C.F.R. § 416.929(c)(3). The ALJ explained that the claimant testified that his job ended in December 2009, when he was laid off because of a lack of work. The ALJ observed that the claimant stopped working because of a business decision "unrelated" to the claimant's health. Furthermore, the ALJ carefully considered the claimant's physical struggle during the four day period in 2010 that he worked as a sheet rocker. The ALJ observed that this work, per the vocational expert's testimony, was at a medium level, and the claimant had performed it at a heavy level. Therefore, the ALJ properly determined that the claimant's light residual functional capacity would not include the exertional demands required to hang sheet rock. In addition, the ALJ noted that the claimant continued to work as a sheetrocker until 2010, which indicated that the claimant had worked for "quite a few years" after his heart attack in 2004. (R. 131).

Although the claimant argues that the ALJ failed to consider the medical evidence "documenting a decline in his health," this claim lacks merit. The claimant failed to point to any medical evidence in his record that demonstrates that he cannot do any work. Furthermore, the ALJ's residual functional capacity determination eliminates the past work that the claimant physically struggled to complete, and medical evidence supports the claimant's residual functional capacity limitations. The ALJ emphasized that the record of the claimant's course of treatment for his impairments, opinion evidence, the claimant's own report of his activities of daily living, and the medical treatment records all show "a greater capacity than described by the claimant." (R. 131).

**3.  The ALJ properly considered evidence of the claimant's "non-compliance."**

The claimant contends that the ALJ improperly considered evidence of the claimant's

"non-compliance" with medication and medical advice when evaluating the credibility of the claimant's subjective complaints. Refusal by a claimant to follow prescribed medical treatment without good cause will preclude a finding of disability. 20 C.F.R. § 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison,* 355 F.3d at 1275. The ALJ noted that despite his heart attack in 2004, the claimant remained a heavy smoker and alcohol abuser. Furthermore, the ALJ emphasized that the claimant had not visited his cardiologist in about a year prior to the hearing. The ALJ considered this lack of ongoing treatment an indication that the claimant's heart problems had not required frequent medical intervention.

However, when the ALJ had questioned the claimant regarding follow-up treatment, the claimant testified that he had no insurance and was following up with Dr. Kynerd, his primary care doctor instead of a cardiologist. Furthermore, the ALJ noted Dr. Kynerd's records indicating that the claimant continued treatment for his coronary artery disease. (R. 135). Nevertheless, the ALJ did not commit reversible error in failing to consider the claimant's financial situation because he did not substantially base his finding on the claimant's noncompliance.

**4.  The Appeals Court properly considered the additional evidence.**

Finally, the claimant contends that additional evidence submitted after the hearing support the severity of the claimant's ongoing symptoms.  The claimant asserts that medical records from UAB Health Systems dated January 27, 2013 through July 30, 2013 indicated that he is disabled.   The court disagrees.

New and material evidence may be presented to the Appeals Council, and the Council must consider such evidence in determining whether to review the ALJ's decision. 20 C.F.R. §§

404.967, 404.970(b); *Falge v. Apfel*, 150 F.3d 1320, 1322-24 (11th Cir. 1998). The Appeals Council properly considered the medical records from UAB Health System, which included the records from the claimant's three hospitalizations in 2013. Furthermore, the Appeals Council explained that this new information did not affect the ALJ's decision about whether the claimant was disabled beginning on or before December 6, 2012, the date of the ALJ's decision.  The Appeals Council properly explained that the claimant must apply again to be reconsidered with this new information. Therefore, this new evidence does not affect the ALJ's decision. (R. 2).

## VII. CONCLUSION

For the reasons stated above, this court concludes that the ALJ applied the proper legal standards and that substantial evidence supports his decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 28th day of August, 2015.


KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

27